UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PERFICIENT, INC., | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 4:20-cv-618-MTS |
| DAVID PALFERY, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

As presented to the Court, the key issue in this case is whether Defendant David Palfery digitally accepted non-compete covenants contained in agreements titled "Restricted Stock Award and Non-Competition Agreement" ("RSA"). The Court held a two-day bench trial on this action. Plaintiff's theory is that when Defendant clicked to accept his employee stock awards from Plaintiff, he also accepted the terms of the RSAs. If true, the RSA is a so-called "clickwrap" agreement. A clickwrap agreement appears on a webpage and requires a user to consent to any terms or conditions by clicking on a box before proceeding with an online transaction. *Foster v. Walmart, Inc.*, 15 F.4th 860, 863 (8th Cir. 2021) (describing clickwrap agreement where party is required to "explicitly assent by clicking 'I agree' (or something similar) before" accepting terms). At trial, Plaintiff contended Defendant must have affirmatively clicked a box on the website acknowledging receipt of and assent to the RSA terms before he could have accepted the stock awards. Having considered each party's evidence, exhibits, and arguments of counsel, the Court enters this Memorandum Opinion with Findings of Fact and Conclusions of Law. As explained herein, the Court concludes Plaintiff failed to show, by a preponderance of the evidence, that Defendant accepted the RSAs. Therefore, the Court will enter judgment in favor of Defendant.

1

I.   **Findings of Fact**[1]

1.   Plaintiff is a Fortune 500 company that provides a broad variety of technology consulting services, software products, platforms, and technology.  Doc. [42] ¶ 1.[2]

2.   Defendant worked for Plaintiff from June 2012 to November 2019.  Doc. [42] ¶ 6.

3.   At the time of his initial employment, Defendant and Plaintiff entered into an agreement titled "Confidentiality and Intellectual Property Agreement" ("CIPA").  Doc. [42] ¶ 12.

4.   The Parties stipulated that no claims remain based on the CIPA.  Doc. [42] ¶ 12.

5.   The two remaining claims are for breach of the RSA (Count I) and unjust enrichment (Count II).

6.   In 2014, Defendant was promoted to Director.  Doc. [42] ¶ 6.

7.   Upon his promotion to Director, Defendant received annual awards of restricted stock ("stock award").  Doc. [42] ¶ 13.

8.   Defendant received stock awards instead of a salary increase for his promotion.  Doc. [75] at 211:20–212:3.

9.   The stock award is a "component of compensation" designed to incentivize employees to stay with the company.  *See* Def. Tr. Ex. BB.

10.   During all times relevant to Defendant's stock awards, Plaintiff used E*Trade as a third-party vendor to administer the Plaintiff restricted stock program.  Doc. [42] ¶ 15.

---

[1] Because the Court finds Plaintiff failed to show "acceptance," the Court will include in its Findings of Fact only those facts relevant to determining the merits of contract formation.

[2] Doc. [42] is the parties Joint Stipulation of Facts.

    11.    Defendant received the following stock awards:

        i.    November 4, 2014—1025 shares

        ii.    November 5, 2015—1659 shares

        iii.    November 4, 2016—1582 shares

        iv.    November 3, 2017—1491 shares

        v.    November 2, 2018—1355 shares

Pl. Tr. Ex. 13.

    12.    Each stock award was subject to a vesting schedule, vesting in one-third increments over a span of three years. Doc. [42] ¶ 13.

    13.    The shares received by Defendant vested according to the schedule in Plaintiff's Trial Exhibit 13. *See* Pl. Tr. Ex. 13.

    14.    Plaintiff's Trial Exhibit 13 shows each of Defendant's stock awards, the award date, the one-third increment vesting dates, the shares awarded, the shares vested on each vesting date, and the historical stock price on the vesting date. *See* Pl. Tr. Ex. 13.

    15.    Katy Winkelmann, Assistant Corporate Controller for Plaintiff, created Exhibit 13 based on her review of reports and charts from E*Trade. Doc. [75] at 95:21–96:19; 93:19–11.

    16.    Winkelmann stated one such E*Trade report shows the time and date of Defendant's "acceptance."[3] Doc. [75] at 96:20–97:4; *see also* 90:16–23.

    17.    Winkelmann testified she did not provide the original E*Trade reports she used to create Plaintiff's Trial Exhibit 13 to the attorneys in this case. Doc. [75] at 96:5–9.

    18.    Plaintiff provided no report or digital screenshot showing Defendant accepted any of the five RSAs.

---

[3] This testimony is unclear whether Winkelmann is referring to a report showing Defendant's acceptance of the award or the RSA or both.

19. Plaintiff has access or would have had access to that data at any point in time and could log into E*Trade and pull information for all of employee-awardees.  Doc. [75] at 96:1–4.

20. Plaintiff supplied E*Trade with a "template" RSA.  Doc. [75] at 85:22–86:24.

21. E*Trade then populated the form RSA to create a customized RSA for each awardee, including the awardee name, date, and a vesting schedule.  Doc. [75] at 86:17–20.

22. The five RSAs for Defendant do not show a vesting schedule.  *See* Pl. Tr. Ex. 1–5.

23. The five RSAs do not have Defendant's electronic signature or initials.  *See* Pl. Tr. Ex. 1–5.

24. An awardee-employee does not have to put their name, signature, date, initials, social security number, or "any data entry" to "accept" the RSA.  Doc. [75] at 106:2–19.

25. Defendant received and accepted each stock award through the E*Trade website.  Doc. [42] ¶ 15.

26. Plaintiff did not introduce any screenshots or evidence of the E*Trade webpage to show content, design, or layout.

27. Before accepting the stock award, Defendant received an email with a link to the E*Trade website to accept his stock through E*Trade.  Doc. [75] at 146:8–13; 228:1–4; 87:13–22.

28. On the webpage, there is a button to click to accept the stock awards.  Doc. [75] at 148:6–7; 228:5–6; Doc. [76] at 9:18–21.

29. Defendant did not click on or review any links when he accepted his stocks in 2015, 2016, 2017, and 2018.  Doc. [75] at 147:19–20.

30. Defendant clicked a button to accept the stock award in 2014, 2015, 2016, 2017, and 2018.  Doc. [75] at 146:17–20.

31. The RSAs terms and conditions are not laid out preceding the "accept" button.  Doc. [75] at 9:5–9; 104:20–105:5.

32. E*Trade, not Plaintiff, operated the website used for award acceptance. Doc. [75] at 87:21–22.

33. No one from E*Trade testified at trial.

34. At trial, Winkelmann testified as to the E*Trade stock award and RSA acceptance process based on her personal experience of accepting stock awards once per year from 2015 to 2019. Doc. [75] at 99:18–100:13; 88:14–89:5; 90:9–15.

35. Winkelmann never worked for E*Trade, has no technical background, and does not know the term "clickwrap agreement." Doc. [75] at 102:10–11; 101:5–7.

36. Winkelmann testified "it had been a while" since she had accepted a stock award on E*Trade so she contacted E*Trade to get familiar with it and "refresh [her] memory." Doc. [75] at 100:4–13.

37. After contacting E*Trade, Winkelmann did not take any screenshots of the webpage or content, request E*Trade for any screenshots, or ask E*Trade for a template of the information that was contained on the page where someone would have to go to accept. Doc. [75] at 100:22–101:7.

38. Winkelmann testified that "typically" or "usually" there is language indicating the employee cannot accept the stock award without opening a link. Doc. [75] at 99:2–7.

39. Winkelmann did not know the exact language. Doc. [75] at 104:17–25.

40. Winkelmann did not know what the button to accept itself said. Doc. [75] at 99:11–17.

41. Plaintiff did not introduce any template or screenshots of the E*Trade webpage to show the language that would alert the awardee to press on any link.[4]

---

[4] Winkelmann gives conflicting testimony and Defendant does not recall with any specificity the text of the E*Trade site.

5

42. Winkelmann did not know what would happen if a person attempted to accept the stock without linking to any document.[5]  Doc. [75] at 103:5–8.

43. Matt Morse, a former employee of Plaintiff, received E*Trade-administered stock awards from Plaintiff on five occasions between 2012 and 2017.  Doc. [76] at 9:4–11.

44. Morse never received or signed an RSA while working for Plaintiff.  Doc. [76] at 10:4–6.

45. Morse testified he was not required to click on a document link to accept the stock when he received E*Trade-administered stock awards.  Doc. [76] at 9:4–11.

46. Morse stated when he accepted his stock award, no agreements were ever linked or attached.  Doc. [76] at 9:14–10:3.

47. Morse accepted a job offer from 3Cloud, LLC ("3Cloud") in December of 2016 while still working for Plaintiff.  Doc. [76] at 11:4–9.

48. Morse did not give Plaintiff his resignation notice until early March 2017.  Doc. [76] at 11:4–13.

49. Despite this delay, Plaintiff never pursued Morse legally. Doc. [76] at 11:19–22.

50. Morse received all fully vested stock as of his departure date. Doc. [76] at 10:7–9.

51. Resigning employees are supposed to receive off-boarding packets including all agreements they signed with Plaintiff.  Doc. [75] at 76:15–23.

52. Upon Morse's departure, he received such a packet, but it did not contain an RSA.  Doc. [76] at 10:10–11:3.

---

[5] This contradicts Winkelmann's own testimony where she explains it is not possible to accept the stock award without opening the RSA.  Doc. [75] at 90:7–14; 89:16-25.

6

53. In the four months leading up to Defendant's departure from Plaintiff, Defendant discussed with his supervisor, Jason Barrett, that he desired to change his role with Plaintiff. Doc. [42] ¶ 11.

54. Barrett told Defendant that a promotion to the next superior management position was not "in the cards" for Defendant. Doc. [42] ¶ 11.

55. On September 25, 2019, Defendant accepted a job at 3Cloud. Doc. [42] ¶ 17; Pl. Tr. Ex. 10.

56. Defendant was still employed by Plaintiff when he accepted the 3Cloud position. Doc. [75] at 110:14–15.

57. Defendant informed 3Cloud that he was bound by the terms and obligations of the CIPA he executed with Plaintiff. Doc. [42] ¶ 20.

58. Defendant did not disclose the RSAs to 3Cloud because *he did not know such agreements existed*. Doc. [42] ¶ 20.

59. Defendant deferred his start date at 3Clould until November 2019. Doc. [75] at 110:21–24.

60. Defendant chose the delayed start date because he wanted to wait until three additional stock awards from Plaintiff vested on November 2, 3, and 4, 2019. Doc. [75] at 110:25–111:3.

61. On November 2, 2019, the first increment of Defendant's 2018 stock award vested. Pl. Tr. Ex. 13.

62. On November 3, 2019, the second increment of Defendant's 2017 stock award vested. Pl. Tr. Ex. 13.

63. On November 4, 2019, the final (third) increment of Defendant's 2016 stock award vested. Pl. Tr. Ex. 13.

64. On November 4, 2019, Defendant resigned from Plaintiff. Doc. [75] at 112:7–22.

65. Defendant would not have received the three vested stock increments in November 2019 if he had resigned from Plaintiff prior to the vesting date. Doc. [75] at 93:1–4; 95:8–13.

66. When Defendant resigned, he forfeited approximately 1400 shares of stock that he had been awarded but had not vested yet. Pl. Tr. Ex. 13.

67. In 2019, Plaintiff stopped using E*Trade and began using a different service. Doc. [75] at 97:10–12.

68. Plaintiff's practices with E*Trade did not change from 2015 to 2019. Doc. [75] at 107:22–108:2.

69. Defendant did not accept the RSAs.

## II. Conclusions of Law

### a. *Breach of Contract*

Plaintiff claims Defendant accepted the RSAs—where the non-competes in this case are contained—by clicking to accept his stock awards on the E*Trade website. Defendant argues he did not accept the RSAs, and therefore a valid contract was never formed. The Court finds Plaintiff failed to meet its burden to show, by the preponderance of evidence, that Defendant digitally accepted the RSAs.

When presented with an issue relating to the validity of online agreements, Missouri courts "apply traditional principles of contract law and focus on whether the plaintiff had reasonable notice of and manifested assent to the online agreement."[6] *Major v. McCallister*, 302 S.W.3d 227, 229 (Mo. Ct. App. 2009). To prove a valid and enforceable contract, Missouri law requires offer, acceptance, and consideration. *See Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 774 (Mo. banc

---

[6] The parties agree Missouri law applies.

2014). "If a party fails to prove one of the elements of a breach of contract action, his claim fails." *Midwest Bankcentre v. Old Republic Title Co. of St. Louis,* 247 S.W.3d 116, 128 (Mo. Ct. App. 2008). "The burden of proof rests with the party claiming breach of contract." *Taney Cty. Title & Escrow, LLC v. Jensen*, 600 S.W.3d 16, 25 (Mo. Ct. App. 2020); *accord Chavis Van & Storage of Myrtle Beach, Inc. v. United Van Lines, LLC*, 784 F.3d 1183, 1189 (8th Cir. 2015) (applying Missouri substantive law and quoting *Scheck Indus. Corp. v. Tarlton Corp*., 435 S.W.3d 705, 723 (Mo. Ct. App. 2014)). Thus, it is Plaintiff's burden—not Defendant's—to prove Defendant accepted the online RSAs as part of the stock awards. When resolving a contract dispute, the Court employs a preponderance of the evidence standard of proof. *Horning v. White*, 314 S.W.3d 381, 385 (Mo. Ct. App. 2010).

Missouri law recognizes electronic modes of acceptance as valid and binding. *Major*, 302 S.W.3d at 229 ("Courts routinely enforce clickwraps."). Even where, as here, there is *no* evidence that a party electronically signed the agreement sought to be enforced, Missouri courts and federal courts applying Missouri law have held "click-to-accept" types of online agreements, like the alleged RSA here, are enforceable. *See, e.g.*, *Vest v. Cracker Barrel Old Country Store, Inc.*, 371 F. Supp. 3d 593, 598 (W.D. Mo. 2018); *Major*, 302 S.W.3d at 229 ("Assent is manifested on clickwrap sites, usually by clicking a box or a button (i.e., 'I Agree')."); *Burcham*, 2009 WL 586513 at *4. These courts look to different types of evidence, as cited below, to determine whether a party accepted an agreement via a website or other electronic means. But none of those situations are present here.

Plaintiff provides no evidence of a screenshot of or a digital time-stamped report showing Defendant "accepted" the RSA.[7] *See, e.g.*, *Franklin v. Cracker Barrel Old Country Store*, 4:17-

---

[7] There is a dispute between the parties because Winkelmann testified there is a report that shows the "date and time" Defendant "accepted," either the RSA, stock awards, or both. Doc. [75] at 97:3–4. But no report of that sort was

9

cv-289-JMB, 2017 WL 7691757, at *1–4 (E.D. Mo. Apr. 12, 2017) (finding "acceptance" based on a screenshot of a time-stamped report showing plaintiff launched the "arbitration module" and clicked "mark complete") (Doc. [10-1] at 11, 13); *Vest*, 371 F. Supp. 3d at 598 (finding employer's online training system indicated Plaintiff marked "complete" after opening the module thereby indicating her acceptance); *Strain v. Murphy Oil USA, Inc.*, 6:15-cv-3245-MDH, 2016 WL 540810, at *3-4 (W.D. Mo. Feb. 9, 2016) (finding "acceptance" where evidence showed plaintiff checked a box indicating she completed an online signature and appearing under her name was a "confirmation" she was subject to agreement).  If there is truly a report that "record[ed] whether [awardee-employees] clicked on the [RSA] links"—i.e.: accepted the RSA—such evidence would indefinitely "contradict" Defendant's claim that he never saw the RSA.  *Karzon v. AT&T, Inc.*, 4:13-cv-2202, 2014 WL 51331, at *3 (E.D. Mo. Jan. 7, 2014) (quoting *Campbell v. General Dynamics, Gov't Syst. Corp.,* 407 F.3d 546 (1st Cir. 2005)).  But no such evidence is before the Court.

Plaintiff submitted no evidence that Defendant "logged into the [E*Trade] website with his ID and password and viewed the web page with the" RSA, as opposed to the stock award. *Franklin*, 2017 WL 7691757, at *4 (finding such evidence shows acceptance); *Vest*, 371 F. Supp. 3d at 596–97 (noting defendant submitted records showing plaintiff, using her employee identification number and unique password, launched the "arbitration module" and clicked "mark complete" on a certain date); *Karzon*, 2014 WL 51331 at *1–2 (stating defendant's records established plaintiff, with his "unique username and password," accessed the email and webpage pertaining to the agreement and clicked the "review completed" button, and thus, plaintiff accepted

---

provided to Plaintiff or is before the Court.  The document Plaintiff cites to suggest such report is in evidence, PERFICIENT 000094, does not so much as reference the RSA, has no "time" stamp as Winkelmann described, and most notably, Plaintiff did *not admit PERFICIENT 000094 into evidence at trial*.  Doc. [68-1] (PERFICIENT 000094).

10

the agreement). Nor did Plaintiff submit evidence showing Defendant was required to use a unique username, identification number, and/or password to "accept" the RSA itself,. *See, e.g.*, *Strain*, 2016 WL 540810 at *1 (finding "acceptance" when to electronically sign the agreement a party must enter 4 fields—their name, social security number, an acknowledgment they have read the agreement and the date). To the contrary, here, an awardee-employee did *not* have to put their name, date, initial, social security number, or *any individualized information* when "accepting" the RSA.

Plaintiff did not introduce the email alerting Defendant to the stock award. *See e.g.*, *Karzon*, 2014 WL 51331 at *1 (finding "acceptance" where the text of the email contained the phrases "**REVIEW REQUIRED**" and "**Action Required: Notice Regarding Arbitration Agreement**" and "If you do not opt out by the deadline, you are agreeing to the arbitration process set forth in the Agreement"). Nor did Plaintiff introduce screenshots or other documentary evidence of the E*Trade webpage to supply the language that would have supposedly put Defendant on notice of the RSA. *Hennessey v. Kohl's Corp.*, -- F. Supp. 3d --, 2021 WL 5415031, at *4 (E.D. Mo. Nov. 19, 2021) (analyzing screenshot of webpage); *Vest*, 371 F. Supp. 3d at 598 (same); *Burcham*, 2009 WL 586513 at *4 (same); *Foster*, 15 F.4th at 864 (reversing summary judgment where party seeking to enforce a clickwrap agreement failed to provide sufficient evidence of the webpage).

Evidence of the E*Trade webpage is especially important here because the parties stipulated to the fact that Defendant did not know the RSAs existed. Doc. [42] ¶ 20. Under Missouri law, Defendant will be bound by the RSA if he was "on notice of contract terms available on the internet," even if he did not read the RSA or click the link. *Burcham*, 2009 WL 586513 at *2 (applying Missouri law); *cf. Franklin*, 2017 WL 7691757, at *6 ("Under Missouri law, 'a person who has an opportunity to read a document but signs it without doing so is held to have knowledge

11

of the document's contents, absent a showing of fraud.'" (quoting *Midwest Printing, Inc. v. AM Int'l, Inc.*, 108 F.3d 168, 170 (8th Cir. 1997)). "Where the website contains an explicit textual notice. . . of the user's intent to be bound," courts typically enforce such agreements. *Hennessey*, 2021 WL 5415031 at *4; *cf. Foster*, 15 F.4th at 864 (explaining "reasonably conspicuous" language puts website user on notice). In the absence of evidence that Defendant, the website user, had actual knowledge of the agreement, the Eighth Circuit has made clear that evidence of the clickwrap itself, not just the agreement, is necessary to determine whether the website puts a user on reasonable notice of the terms of the contract. *See Foster*, 15 F.4th at 864.[8] Here, there is no credible evidence of the E*Trade website's language, content, design, or layout. *Major*, 302 S.W.3d at 230 (analyzing webpage layout and concluding user had notice of terms); *Margulis v. HomeAdvisor, Inc.*, 4:19-cv-00226-SRC, 2020 WL 4673783, at *2 (E.D. Mo. Aug. 12, 2020) (finding website user had constructive notice of terms where hyperlink to Terms and Conditions was conspicuously displayed in blue font); *Hennessey*, 2021 WL 5415031 at *13–14 (concluding webpage design "buried" the relevant language, failing to create even constructive notice). Thus, the Court cannot determine whether Defendant had "reasonable notice of and manifested assent to the" RSA when he accepted the stock awards. *Major*, 302 S.W.3d at 230 (finding "acceptance" where webpage put user on notice of the agreement, regardless of if the user clicked on the link or read the agreement).

Truly, Plaintiff provided no evidence of any digital footprint linking Plaintiff to the RSAs. Instead, Plaintiff attempts to use Winkelmann as a conduit of proof that Defendant saw and

---

[8] In *Foster*, Walmart provided a printed copy of its website's online terms and conditions as part of its motion. *Foster v. Walmart, Inc.*, 15 F.4th 860, 864 (8th Cir. 2021). The Eighth Circuit noted that the terms "provide[d] some insight," but that "without more, it is difficult to determine whether a reasonably prudent user would have known to inquire further." The court stated that "[a]mong the yet-unanswerable questions are the exact location and prominence of the terms-of-use hyperlink [and] how many clicks it would have taken for the user to discover the arbitration provision . . . ." In reversing summary judgment, the Eighth Circuit found the lack of "record clear about the structure and design of the website itself" a factual question precluding summary judgment.

12

assented to the RSAs.  But Plaintiff offers no other evidence to support Winkelmann's testimony. *Strain*, 2016 WL 540810 at *3 (finding both documentation of electronically "signed" agreement and testimony of online application process prove plaintiff had to complete document before continuing with application); *Franklin*, 2017 WL 7691757, at *4 (relying on affidavit of online acceptance process and supporting evidence of online reports and screenshots); *Margulis*, 2020 WL 4673783 at *2 (same).  What the Court finds notably peculiar here is that Winkelmann testified that supporting documents do exist and are available to Plaintiff, and Plaintiff could have used these documents to meet its burden, but for some reason, it did not.[9]  Indeed, evidence of the alleged clickwrap language alerting Defendant to the RSA or a time-stamped record establishing Defendant's acceptance of the actual RSA—as opposed to just the stock award—is precisely the type of evidence courts look to when presented with an argument that a click-wrap agreement was not validly formed.  Winkelmann—who relied on these E*Trade reports/documents to help "refresh her memory" for her affidavit, in-court testimony, and to produce Plaintiff's Trial exhibits—testified that the supporting documentation is available to Plaintiff at any time.  Thus, the Court is left to question that if the E*Trade reports and documentation truly do contain favorable information evincing Defendant accepted the RSA, as Winkelmann so testifies, why would Plaintiff *not* introduce the evidence?[10]  This question is even more pronounced given that

---

[9] Winkelmann's testimony established she reviewed E*Trade records on a database of information originally created by E*Trade and based her conclusions about acceptance on her review of that information.  Winkelmann specifically testified that Plaintiff would "have access or would have had access to that data at any point in time.  As plan administrators, we could log into E*Trade and pull information for all of participants awardees." Doc. [75] at 96:1–4.  Then, she goes on to admit that the reports she used to generate this information she did not provide to the attorneys in this case.  *Id*. at 96:5–10.  Winkelmann then stated there is an actual report that shows "date and time" of acceptance. *Id.* at 96:20–25-97:1–4.  But whether this means acceptance of the RSA or acceptance of the stock is not clear. Winkelmann also stated, "it had been a while" since she had accepted an award on E*Trade so she contacted E*Trade to get familiar with the webpage and "refresh [her] memory." *Id.* at 100:4–13.  But she did not take any screenshots or request E*Trade for any screenshots of the webpage, content, or language. *Id.* at 100:22–101:7.

[10] Defendant argues Plaintiff failed to produce or hid from Defendant these E*Trade records.  Doc. [67].  Because the Court finds for Defendant, the Court does not address the validity of this Motion.

Plaintiff is a Fortune 500 *technology* company, with experience in similar software and platforms.[11]  But the record is devoid of any evidence showing Plaintiff electronically "accepted"—or even reviewed—the RSA upon accepting the stock awards.  *Kelly v. Aliera Companies, Inc.*, 6:20-cv-5038-MDH, 2020 WL 6877574, at *5 (W.D. Mo. Nov. 23, 2020) (finding no enforceable agreement when no evidence showed plaintiff "received, reviewed, or specifically acknowledged the specific terms of the [agreement] when they electronically signed the online forms to become a member").  The Court does not find it satisfactory that Plaintiff did not produce any evidence to support the testimony of Winkelmann—an employee who has no technical background, never worked for E*Trade, and most notably, did not even know the term "clickwrap agreement."  Especially because this evidence, which is not before the Court, could be dispositive of many crucial underlying issues in this matter, as Winkelmann and Plaintiff so suggest.  As such, the Court does not find it credible or persuasive that Plaintiff—a Fortune 500 *technology* company—failed to produce a single digital time-stamped report, screenshot of the E*Trade webpage, the supposed clickwrap language, or any other documentary evidence that could demonstrate Defendant accepted the RSAs, especially considering *Plaintiff's* burden.

Plaintiff also points to Winkelmann's declaration averring Defendant accepted the stock awards on a date certain and that it was impossible for him to accept without having access to the RSA.  But this testimony similarly fails to provide sufficient evidence of "acceptance."[12]  *Ramsey*

---

[11] Clickwrap tracking technology can show information with respect to acceptance in this case, such as how much time one spent looking at the document or how far down an individual's scroll bar went on the document.

[12] In *Ramsey*, a strikingly similar a case, the employer sought to enforce an online agreement by using a corporate representative to suggest that an employee must have accepted the terms of a clickwrap.  *Ramsey v. H&R Block Inc.*, 4:18-cv-933-ODS, 2019 WL 2090691, at *1–5 (W.D. Mo. May 13, 2019).  The corporate representative testified it "would have been impossible . . . to have submitted an application . . . without signing the arbitration agreement."  *Id.* at *4.  The court there found evidence of acceptance lacking.  Notably, in *Ramsey*, the employer *did provide a screenshot of the clickwrap pages* showing content and design (unlike in this case), but the court still did not enforce the agreement because the employer failed to provide electronic evidence of "acceptance."  *Id.* at *5; see* 4:18-cv-933 (Doc. [29-1], [29-2], [29-3]).

*v. H&R Block Inc.*, 4:18-cv-933-ODS, 2019 WL 2090691, at *1–5 (W.D. Mo. May 13, 2019) (finding testimony that the alleged breaching party must have accepted the terms of a clickwrap agreement via the online process was insufficient evidence alone to prove acceptance); *Baier v. Darden Restaurants*, 420 S.W.3d 733, 739 (Mo. Ct. App. 2014) (finding no "acceptance" where evidence was limited to a non-signed document and a self-serving claim by the party seeking to enforce the contract); *Welk Resort Sales, Inc. v. Bryant*, 6:17-cv-03197-SWH, 2018 WL 1309738, at *3 (W.D. Mo. Mar. 13, 2018) (same).  Even if the Court were to overlook the preceding case law finding such evidence not sufficiently probative of "acceptance," the result would be the same; Winkelmann's testimony is unsupported by record evidence.  There is conflicting evidence before the Court as to whether Plaintiff's business practice requires *every* employee who receives a stock award to electronically accept an RSA, as Winkelmann claims.  At trial, Matt Morse, a former employee of Plaintiff, testified he was not required to click on a document link to accept the stock when he received E*Trade-administered stock awards from Plaintiff on five occasions between 2012 and 2017.[13]  In fact, Morse testified that he *never* received or signed an RSA while working for Plaintiff, despite receiving five stock awards.  Morse's testimony aligns with Defendant's experience and contradicts Winkelmann's.

While Plaintiff argues other courts have enforced identical RSAs as to former Plaintiff employees, those cases are easily distinguishable from the facts in this case.  *Perficient v. Munley*, 4:19-cv-1565-JAR, 2021 WL 1427797 (E.D. Mo. Apr. 15, 2021); *Perficient v. Gupta*, 4:21-cv-759-HEA (E.D. Mo. July 6, 2021); *Perficient v. Livingston*, 4:21-cv-00404-SRC, 2021 WL 2805282 (E.D. Mo. July 23, 2021).  *Livingston* contains no ruling on anything—the parties settled

---

[13] Plaintiff's practices with E*Trade did not change at all from 2015 to 2019, when Plaintiff stopped using E*Trade. Doc. [75] at 107:22–108:2.

15

and agreed to a consent injunction following ADR.  Further, the main issue in *Munley* and *Gupta*[14] was the validity of the non-compete covenants in the RSA, not the means of acceptance or formation of the RSA.  Despite these glaring differences, the most notable distinction is that in all three cited matters a customized RSA was provided to the Court.  *Munley*, 2021 WL 1427797 (Doc. [1-1] at 3); *Gupta*, 4:21-cv-759-HEA (Doc. [1-1] at 4); *Livingston*, 4:21-cv-00404-SRC (Doc. [1-1] at 5).  Here, unlike those three cases, Plaintiff introduced *no* RSA with a customized vesting schedule for Defendant's stock award.

Not only is this evidence distinguishable from the other litigation, but also bellies Plaintiff's argument that Defendant's conduct demonstrated knowledge of the RSAs.  According to Plaintiff, Defendant had knowledge of the RSA because he resigned on the final day of his stock vesting and "the only document in which the vesting schedules appear is the RSAs themselves."  Doc. [87] at 13.  But Plaintiff's *own* exhibits do not support this theory.  *See* Pl. Tr. Ex. 1–5.  Even more telling is the document Plaintiff relies on to show the vesting dates of Defendant's stock award is Plaintiff's Trial Exhibit 13—*not* one of the five RSAs.  Pl. Tr. Ex. 13.  Thus, Plaintiff cannot show acceptance "demonstrated by conduct."  *Coleman v. Bristol Care, Inc.*, 6:18-cv-04069-MDH, 2018 WL 3848821, at *3 (W.D. Mo. Aug. 13, 2018) (citing *Heritage Roofing, LLC v. Fisher*, 164 S.W.3d 128, 134 (Mo. Ct. App. 2005).

Applying Missouri contract law, the Court concludes Defendant's mere acceptance of the stock awards did not constitute "acceptance" of the RSA.  Plaintiff has not made any showing that Defendant accepted, or even reviewed, the RSAs, as distinct from the stock awards.  Nor can the Court here charge Defendant with notice of the RSA because without any credible evidence of the webpage, the Court cannot assess the quoted language, review the design, and determine if

---

[14] Also, *Gupta* concerned a TRO and the likelihood to succeed on the merits of a challenge to the validity of the RSAs non-compete covenants. *Perficient Inc. v. Gupta*, 4:21-cv-759-HEA, at *2 (E.D. Mo. July 6, 2021).

Defendant had sufficient notice of the RSA. "The bottom line is that, without more information, [the Court is] left to guess." *Foster*, 15 F.4th at 864. Without evidence that Defendant accepted the RSA (as opposed to the stock award)—whether via electronic signature, time-stamped record, or clickwrap language giving "notice"—this Court cannot find acceptance by a preponderance of the evidence. By failing to establish Defendant's acceptance, Plaintiff has not met its burden of proving a valid and enforceable RSA exists. *HM Compounding Servs., LLC v. Express Scripts, Inc.*, 349 F. Supp. 3d 781, 790 (E.D. Mo. 2018) ("If a party fails to prove one of these elements, his [breach of contract] claim fails.") (quoting *Sch. Dist. of Kansas City, Mo. v. Missouri Bd. of Fund Comm'rs*, 384 S.W.3d 238, 259 (Mo. Ct. App. 2012)).

  b. ***Unjust Enrichment***

  Plaintiff argues that, in the alternative of a breach of the RSAs, Defendant unjustly enriched himself by allowing three stock awards to vest in 2019 when he had already accepted a new job.[15] The elements of a claim for unjust enrichment are: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the benefit; and (3) acceptance and retention by the defendant of that benefit under circumstances in which retention without payment would be inequitable. *Aughenbaugh v. Williams*, 569 S.W.3d 514, 527 (Mo. Ct. App. 2018).

  The Court does not find it unjust for Defendant to retain the benefit—the vested stock he received in 2019. Defendant received only one-third of his stock award each year for three years after it was awarded, incentivizing him to continue employment at Plaintiff and forfeiting all unvested stock if he left. The three vested stock increments Defendant received in November 2019 were from a 2016 stock award, a 2017 stock award, and a 2018 stock award. Defendant accepted employment at 3Cloud in September 2019—years or months *after* Plaintiff awarded Defendant

---

[15] Initially, Plaintiff prayed for the return of the value of *all* vested stock in its Complaint. Post-trial, Plaintiff requests the Court award it the value of the post-breach vesting's—the 2019 vested shares. Doc. [87] at 20 n.6.

the stock awards at issue. Thus, Defendant rightfully earned the stock awards from 2016, 2017, and 2018, and Plaintiff received the benefit of its bargain through Defendant's continued service for over half a decade. *See* Def. Tr. Ex. BB (encouraging retention of employees is the purpose of including long-term stock awards as part of compensation). Moreover, when Defendant resigned on November 4, 2019, he forfeited *all unvested* stock—approximately 1400 shares of stock that he had been awarded in subsequent years but had not yet vested. Plaintiff is protected by the vesting schedule, not the other way around. Thus, in the absence of a valid agreement attaching conditions to the stock awards,[16] the Court does not find Defendant's retention of the three vested stock increments in 2019 constitute an unjust enrichment.

## CONCLUSION

The Court concludes the evidence Plaintiff adduced did not prove, by a preponderance of the evidence, that an enforceable contract exists between the parties. Nor does the Court find Defendant's retention of the stock awards that vested in 2019 constitute an unjust enrichment. Accordingly, the Court will enter a judgment in favor of Defendant, which will accompany this Memorandum Opinion. *See* Fed. R. Civ. P. 52, 58.

Dated this 13th day of April, 2022.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE

---

[16] Plaintiff stipulated to no remaining claims under a breach of the CIPA and the Court already found Defendant is not bound by the RSAs.